1

2

3

4                              UNITED STATES DISTRICT COURT

5                                    DISTRICT OF NEVADA

6                                          * * *

7    CUNG LE, NATHAN QUARRY, JON              Lead Case No.: 2:15-cv-01045-RFB-PAL
     FITCH, et al,
                                                            **ORDER**
8                   Plaintiffs,
                                              Member Case Nos.:
9           v.

10   ZUFFA, LLC, d/b/a ULTIMATE
     FIGHTINGCHAMPIONSHIP and UFC,
11

12                  Defendant.

13   ─────────────────────────────────
     KYLE KINGSBURY AND DARREN
14   UYENOYAMA,  on behalf of themselves and   Case No.:  2:15-cv-1046-RFB-PAL
     all others similarly situated,
15

16                  Plaintiffs,

17          v.

18   ZUFFA, LLC, d/b/a Ultimate Fighting
     Championship and UFC,
19
                    Defendant.
20   ─────────────────────────────────
21   LUIS JAVIER VAZQUEZ and DENNIS          Case No.: 2:15-cv-01055-RFB-PAL
     LLOYD HALLMAN,  on behalf of
22   themselves and all others similarly situated,

23                  Plaintiffs,

24          v.

25   ZUFFA, LLC, d/b/a Ultimate Fighting
     Championship and UFC,
26
                    Defendant.
27   ─────────────────────────────────
28

| | |
|---|---|
| BRANDON VERA and PABLO GARZA, on behalf of themselves and all others similarly situated, | Case No.: 2:15-cv-01056-RFB-PAL |
| Plaintiffs, | |
| v. | |
| ZUFFA, LLC, d/b/a Ultimate Fighting Championship and UFC, | |
| Defendants. | |
| GABE RUDIGER and MAC DANNZIG, on behalf of themselves and all others similarly situated, | Case No.: 2:15-cv-01057-RFB-PAL |
| Plaintiffs, | |
| v. | |
| Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, | |
| Defendants. | |

## I.     INTRODUCTION

Before the Court are identical Motions to Dismiss (ECF Nos. 64, 16, 30, 16) in the instant case and member cases 2:15-cv-01046-RFB-PAL, 2:15-cv-01055-RFB-PAL, 2:15-cv-01056-RFB-PAL, and 2:15-cv-01057-RFB-PAL, as well as a Stipulation re: Discovery of Electronically Stored Information (ECF No. 160). For the sake of clarity, the Court will refer to the Motion to Dismiss as ECF No. 64 in the lead case, Case No. 2:15-cv-01045-RFB-PAL. For the reasons discussed, the Court DENIES the Motion to Dismiss (ECF No. 64) and GRANTS the Stipulation re: Discovery of Electronically Stored Information (ECF No. 160).

## II.     BACKGROUND

### A.  Factual Background

The following allegations are common to all five cases against Defendant Zuffa and are drawn from the Plaintiffs' Complaint (ECF No. 1) in Case No. 2:15-cv-01045-RFB-PAL.

1     Plaintiffs are Elite Professional MMA Fighters ("Bout Class Plaintiffs") and those fighters

2  called "Identity Plaintiffs" (collectively, "Plaintiffs"). Plaintiffs bring this action against Defendant

3  Zuffa, LLC, who operates under the trademark Ultimate Fighting Championship or "UFC."  The

4  UFC, which (through the conduct alleged herein) now controls approximately 90% of the revenues

5  derived from live Elite Professional MMA bouts, promotes and distributes professional live MMA

6  bouts through various venues, in the U.S. and internationally. Compl. ¶ 7.

7     Plaintiffs bring antitrust action under Section 2 of the Sherman Act, 15 U.S.C. § 2, for

8  treble damages and other relief arising out of Defendant's overarching anticompetitive scheme to

9  maintain and enhance its (a) monopoly power (the "Relevant Output Market") in the market for

10 promotion of live Elite Professional mixed martial arts ("MMA") bouts, and (b) monopsony power

11 in the market for live Elite Professional MMA Fighter services ("Relevant Input Market"). Compl.

12 ¶ 1. The relevant geographic market for both the Relevant Input Market and Relevant Output

13 Market is limited to the United States and, in the alternative, North America. Id.

14                    **1.  Input Market**

15    By dominating the market for live Elite Professional MMA Fighter services through the

16 scheme alleged herein (including through long-term exclusive agreements with MMA Fighters

17 and other exclusionary and anticompetitive acts), the UFC controls the talents of Elite Professional

18 MMA Fighters, who are popular with national audiences. Id. at ¶ 5.

19    The UFC denied actual and potential rivals necessary inputs to run effective professional

20 MMA Promotion companies, raising their costs and making it impossible for them to compete

21 effectively. As a result of the UFC's exclusionary scheme, multiple actual or potential rivals were

22 forced to sell to the UFC or exit the market entirely. Id. ¶ 11.

23    By following no objective ranking or title criteria, the UFC is able to exert control over its

24 roster of athletes who risk losing the opportunity to be afforded "title bouts" or to earn a living as

25 an MMA fighter. Id. ¶ 17.

26                    **2.  Output Market**

27    Defendant acquired and maintained monopoly power in the Relevant Output Market

28 through a series of exclusionary acts, including (a) direct acquisitions of actual or potential rivals

(who were forced to sell to the UFC because they found it impossible to compete profitably due to the UFC's anticompetitive scheme), as well as (b) a multifaceted scheme to impair and foreclose competition by leveraging the UFC's market dominance—including its tight-fisted control over the supply of Elite Professional MMA Fighters—to block actual or potential rivals from accessing inputs. Id. ¶ 9.

**B.  Procedural History**

On June 4, 2015, the five above-captioned cases were transferred into this District pursuant to an order transferring them from the Northern District of California. Plaintiffs and Defendant filed a Notice of Related Cases in all five cases. ECF Order No. 101 at 2.

The Court summarizes the procedural history for the lead case, 2:15-cv-01045-RFB-PAL, below:

On December 16, 2014, Plaintiffs filed their Complaint in the Northern District of California. ECF No. 1.

On January 30, 2015, Defendant filed a Motion to Transfer case. ECF No. 31.

On February 10, 2015, Plaintiffs filed a Motion to Consolidate Cases. ECF No. 52.

On February 27, 2015, Defendant filed a Motion to Dismiss. ECF No. 64.

On June 2, 2015, the Northern District of California GRANTED the Motion to Transfer Case to the District of Nevada. ECF No. 93.

On September 25, 2015, the Court held a hearing on the parties' outstanding motions in the various cases. ECF No. 186. The Court issued a minute order stating the following:

- Case no. 2:15-cv-01045-RFB-PAL
  - Motion to Dismiss (ECF No. 64) is DENIED;
  - Stipulation of Electronically Stored Information (ECF No. 160) is GRANTED;
- Case no. 2:15-cv-01046-RFB-PAL, Motion to Dismiss (ECF No. 16) is DENIED;
- Case no. 2:15-cv-01055-RFB-PAL, Motion to Dismiss (ECF No. 39) is DENIED;
- Case no. 2:15-cv-01056-RFB-PAL, Motion to Dismiss (ECF No. 39) is DENIED;
- Case no. 2:15-cv-01057-RFB-PAL, Motion to Dismiss (ECF No. 16) is DENIED.

III.     **LEGAL STANDARD**

**A.  Sherman Act, Section 2**

**1.  Monopoly**

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court. 15 U.S.C. § 2.

"To succeed on its claim for actual monopolization under § 2, [plaintiff] must prove [defendant]: (i) possessed monopoly power in the relevant markets; (ii) willfully acquired or maintained its monopoly power through exclusionary conduct; and (iii) caused antitrust injury. Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc., 108 F.3d 1147, 1151 (9th Cir. 1997) (citing Movie 1 & 2 v. United Artists, 909 F.2d 1245, 1254 (9th Cir.1990), cert. denied, 501 U.S. 1230 (1991)).

**a.  Monopoly power**

"Monopoly power is defined as 'the power to control prices or exclude competition.' Mere proof of exclusionary conduct is not sufficient to prove [defendant's] dangerous probability of success; other proof of market power is required." Harcourt, 108 F.3d at 1154 (internal citations omitted).

"Market power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious exercise of market power. If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995).  "The more common type of proof is circumstantial evidence pertaining to the structure of the market. To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are

significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." Id.

"A 'market' is any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel, would have market power in dealing with any group of buyers." Id. "Stated differently, a 'market' is the group of sellers or producers who have the 'actual or potential ability to deprive each other of significant levels of business.'" Id. (internal citation omitted). "First and foremost, the relevant market must be a product market. The consumers do not define the boundaries of the market; the products or producers do." Id. (citing Brown Shoe v. United States, 370 U.S. 294, 325 (1962)). "Second, the market must encompass the product at issue as well as all economic substitutes for the product." Id. "Third, although the general market must include all economic substitutes, it is legally permissible to premise antitrust allegations on a submarket." Id.

Regarding dominant share, the Ninth Circuit has held that a "market share of 44 percent is sufficient as a matter of law to support a finding of market power, if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing." Rebel Oil, 51 F.3d at 1438.

"Entry barriers are 'additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,' or 'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns.'" Id. at 1439 (internal citations omitted). "The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." Id. "To justify a finding that a defendant has the power to control prices, entry barriers must be significant—they must be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting." Id. On the other hand, "[b]arriers to entry are insignificant when natural market forces will likely cure the problem."

**b. Willfully acquired/maintained through exclusionary conduct**

The second factor in determining a monopoly focuses on whether defendant "willfully acquired or maintained monopoly power by engaging in predatory or anticompetitive conduct designed to destroy competition." Movie 1 & 2 v. United Artists Commc'ns, Inc., 909 F.2d 1245, 1255 (9th Cir. 1990).

Determining what constitutes exclusionary conduct can be complex. "Under the best of circumstances, applying the requirements of § 2 'can be difficult' because 'the means of illicit exclusion, like the means of legitimate competition, are myriad.'" Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 414 (2004) (internal citation omitted). For example, "[t]hey may involve a 'course of dealing' that, even if profitable, indicates a 'willingness to forsake short-term profits to achieve an anticompetitive end.'" Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 458 (2009) (quoting Trinko, 540 U.S. at 409).

In the Ninth Circuit, there must be a "'preliminary showing of significant and more-than-temporary harmful effects on competition (and not merely upon a competitor or customer)' before these practices can rise to the level of exclusionary conduct." Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc., 108 F.3d 1147, 1151 (9th Cir. 1997). Such conduct may be inferred. For example, "[t]he showing of a possible split agreement is one piece of circumstantial evidence from which a jury may infer a willful acquisition or maintenance of monopoly power. Market share is another. The fact that [defendant] acquired its prior competitor [], thus eliminating its only serious competition in the market, is further evidence of anti-competitive conduct on the part of [defendant]." Id. In that case, the Ninth Circuit dismissed defendant's motion for summary judgment.

However, certain acts, such as discount pricing alone, may not rise to the level of exclusionary conduct: "the exclusionary conduct element of a claim arising under § 2 of the Sherman Act cannot be satisfied by reference to bundled discounts unless the discounts result in prices that are below an appropriate measure of the defendant's costs." Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 903 (9th Cir. 2008).

### c. Caused antitrust injury

"To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition. If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se." Rebel Oil, 51 F.3d at 1433.

"In deciding whether the plaintiff was injured by an anticompetitive aspect or effect of the defendant's behavior, care must be taken in defining 'competition.' Competition consists of rivalry among competitors… But reduction of competition does not invoke the Sherman Act until it harms consumer welfare." Id.

## 2. Monopsony

The Supreme Court characterizes a monopsony as follows: "Monopsony power is market power on the buy side of the market. As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'" Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 320 (2007).

Citing Weyerhaeuser, the Ninth Circuit found that "[t]he Supreme Court has made clear…that because antitrust law operates to correct all distortions of competition, it condemns market actors who distort competition, whether on the buyer side or seller side … Accordingly, the Court has long understood the Sherman Act to condemn buyer side cartels." California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1161 (9th Cir. 2011)

While monopsonies and monopolies share many similarities, there are circumstances in which only monopsonistic, but not monopolistic behavior, is alleged. See United States v. Syufy Enterprises, 903 F.2d 659, 663 (9th Cir. 1990) "[O]f significance is the government's concession that [the defendant] was only a monopsonist, not a monopolist. Thus, the government argues that [the defendant] had market power, but that it exercised this power only against its suppliers (film distributors), not against its consumers (moviegoers)."

In Syufy, the Court noted that "[w]hile it is theoretically possible to have a middleman who is a monopolist upstream but not downstream, this is a somewhat counterintuitive scenario. Why, if he truly had significant market power, would Raymond Syufy have chosen to take advantage of

the big movie distributors while giving a fair shake to ordinary people? And why do the distributors, the alleged victims of the monopolization scheme, think that Raymond Syufy is the best thing that ever happened to the Las Vegas movie market? The answers to these questions are significant because, like all antitrust cases, this one must make economic sense." Id.

In this case, as in Weyerhaeuser, the Plaintiffs allege that the Defendant engaged in both monopolistic and monopsonistic behavior. The Supreme Court applies the monopoly test regarding predatory pricing, to their analysis of whether the Defendant engaged in a monopsony: "The general theoretical similarities of monopoly and monopsony combined with the theoretical and practical similarities of predatory pricing and predatory bidding convince us that our two-pronged Brooke Group test should apply to predatory-bidding claims." Weyerhaeuser, 549 U.S. at 325. Therefore, the Court applies the standard for monopoly under Section 2 of the Sherman Act.

### B.  Motion to Dismiss under Rule 12(b)(6)

An initial pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The court may dismiss a complaint for failing to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

In ruling on a motion to dismiss, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." Faulkner v. ADT Sec. Servs., Inc., 706 F.3d 1017, 1019 (9th Cir. 2013) (citations omitted).

To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but merely asserting "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" is not sufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "As a general rule, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) (citation and internal quotation marks omitted).

### C.  Motion to Dismiss a Sherman Act Claim

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that

1  a 'relevant market' exists and that the defendant has power within that market." Newcal Indus.,

2  Inc. v. Ikon Office Solution, 513 F.3d 1038, 1044 (9th Cir. 2008).

3      "There is no requirement that these elements of the antitrust claim be pled with specificity."

4  Newcal, 513 F.3d at 1045. "An antitrust complaint therefore survives a Rule 12(b)(6) motion

5  unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal

6  defect. And since the validity of the 'relevant market' is typically a factual element rather than a

7  legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing

8  by summary judgment or trial." Id. See Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.,

9  99 F.3d 937, 950 (9th Cir. 1996) ("In order to survive a motion to dismiss under Rule 12(b)(6), an

10  antitrust complaint 'need only allege sufficient facts from which the court can discern the elements

11  of an injury resulting from an act forbidden by the antitrust laws.' CMS's complaint should not be

12  dismissed unless it appears beyond doubt that CMS can prove no set of facts in support of its claim

13  which would entitle it to relief") (quoting Newman v. Universal Pictures, 813 F.2d 1519, 1522

14  (9th Cir.1987), cert. denied, 486 U.S. 1059 (1988).; SmileCare Dental Group v. Delta Dental Plan

15  of California, Inc., 88 F.3d 780, 783 (9th Cir.1996)).

16      "There are, however, some legal principles that govern the definition of an antitrust

17  'relevant market,' and a complaint may be dismissed under Rule 12(b)(6) if the complaint's

18  'relevant market' definition is facially unsustainable." Newcal, 513 F.3d at 1045.

19

20  **IV.   DISCUSSION**

21      Defendant makes three main arguments as to why the case should be dismissed under Rule

22  12(b)(6). The Court addresses each argument below.

23                **A.  Strong Competition v. Antitrust Violation**

24      While Defendant attempts to characterize its own behavior as "strong competition," the

25  Court does not construe Plaintiffs' *Complaint* to allege that Zuffa's behavior is merely "strong

26  competition." Rather, Plaintiffs argue that Zuffa's conduct "has foreclosed competition and

27  thereby enhanced and maintained the UFC's monopoly power in the Relevant Output Market and

28

1   monopsony power in the Relevant Input Market." Compl. at ¶ 5. These claims state an antitrust

2   violation. The Court rejects Defendant's first argument.

3                      **B.  Properly Defined Relevant Markets**

4           Because the Court construes the need for a plaintiff alleging a Sherman Act Section 2 claim

5   to define a "relevant market" in order to survive a motion to dismiss, the Court focuses its attention

6   on this specific argument. See Newcal, 513 F.3d at 1044-45.

7           In their Complaint, Plaintiffs refer to two relevant markets: "live Elite Professional MMA

8   bouts (the 'Relevant Output Market'), and … live Elite Professional MMA Fighter services (the

9   'Relevant Input Market')." Compl. at ¶ 4. Plaintiffs define "Elite Professional MMA Fighter" as

10  the following: "any Professional MMA Fighter who has demonstrated success through

11  competition in local and/or regional MMA promotions, or who has developed significant public

12  notoriety amongst MMA Industry media and the consuming audience through demonstrated

13  success in athletic competition. All UFC Fighters are Elite Professional MMA Fighters." Compl.

14  ¶ 30(d).

15          Defendants argue that "[b]oth of Plaintiffs' market definitions are based on what the

16  Complaints describe as 'Elite Professional MMA fighters,' a term not used in the industry and

17  apparently created solely for the purpose of this litigation. Plaintiffs do not define the contours of

18  these markets, particularly in what distinguishes an 'Elite' fighter from other Professional MMA

19  fighters, in any understandable, much less a legally cognizable, way." Mot. Dismiss at 17. In

20  support of this argument, Zuffa argues that "courts have repeatedly rejected attempts to define

21  narrow antitrust markets by subjective, vague terms purporting to reflect alleged qualitative

22  differences because such distinctions are "economically meaningless where the differences are

23  actually a spectrum of price and quality differences." Mot. Dismiss at 18 (citing In re Super

24  Premium Ice Cream Distrib. Antitrust Litig., 691 F. Supp. 1262, 1268 (N.D. Cal. 1988)).

25          The Court finds that Defendant cites to no controlling case law, and that on the contrary,

26  the Ninth Circuit has held that, with regards to the requisite specificity needed to define the

27  "relevant market" in a Section 2 Sherman Act claim, "[a]n antitrust complaint [] survives a Rule

28  12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers

a fatal legal defect. And since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." Newcal, 513 F.3d at 1045. Here, Defendant does not argue that the Complaint suffers from a facial deficiency. Rather, Defendant attempts to argue that the term "elite" is subjective and vague.

Plaintiffs argue that the "Elite" designation is well understood in the industry. Opp'n at 5. Plaintiffs argue that the UFC has cornered the "elite" market. As a result, Plaintiffs allege that "the UFC controls the talents of Elite Professional MMA Fighters, who are popular with national audiences." Compl. at ¶ 5. This is supported by allegations that "[w]ithout big-ticket MMA Cards with Elite Professional MMA Fighters, MMA Promoters are unable to generate sufficient public demand to lock down sponsors and venues large enough to generate enough revenues to be able to offer sufficient bout purses that would enable them to attract Elite Professional MMA Fighters." Compl. at ¶ 108.

Plaintiffs also argues that "the MMA industry itself distinguishes Elite from non-Elite Fighters: the UFC has identified its fighters as "elite[-]level;" investment analysts like Moody's describes UFC's market dominance based on its 'elite' fighters; and fighters, fan blogs and websites use the same terms." Opp'n at 6, n.6.

Last, the Plaintiffs argue, and the Court agrees, that the Supreme Court has recognized distinctions in different levels of athletic competitions to constitute a relevant market for the purpose of the Sherman Act: "championship boxing is the 'cream' of the boxing business, and … is a sufficiently separate part of the trade or commerce to constitute the relevant market for Sherman Act purposes." Int'l Boxing Club of N. Y., Inc. v. United States, 358 U.S. 242, 252 (1959). This finding was supported by the large gap between the championship and non-championship markets such as: average revenue; the costs of television rights; revenues for movie rights compared to the non-existence of non-championship picture rights; and the amount that spectators pay for tickets to championship fights than for nontitle fights. Id. at 250-51.

Defendant replies by arguing that, in these cases, the market was defined around "objective, clearly definable categories such as particular leagues, divisions, or events." Reply at 10.

The Court understands that distinctions of elite and non-elite status, the "relevant market," will vary from sport to sport. See United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956) ("The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration."). To find whether the Plaintiffs defined a relevant market within a sport, therefore, the Court must take into consideration how athletes in their respective fields are ranked with regards to one another.

Plaintiffs alleges that through UFC's monopolistic/monopsonistic power over the relevant input and output markets, the UFC has created the exact championship league held to be the relevant market in other sporting contexts: "The UFC is an individual sport that issues championship titles to athletes competing in, and winning, title bouts. The UFC follows no independent ranking criteria, nor does it establish any objective criteria for obtaining a title bout. By following no objective criteria, the UFC is able to exert considerable control over its roster of athletes who risk losing the opportunity to be afforded 'title bouts' or to earn a living as an MMA fighter." Compl. ¶17. The Court therefore finds that the Plaintiffs' relevant market is sufficient for Section 2 purposes. Plaintiffs allege that the elite market is captured by UFC and that elite status is reflected in part by the amount of media attention elite MMA fighters receive.

Second and related, Defendant argues that "Plaintiffs' allegation that 'all or virtually all . . . Elite Professional MMA fighters' are under contract to the UFC is just a tautology to create a single-brand market comprised solely of UFC fighters under a different name." Mot. Dismiss at 18-19. In support of this argument, Defendant argues that "Courts' acceptance of such circular, single-brand markets 'are, at a minimum, extremely rare.'" Id. (quoting Apple, Inc. v. Psystar Corp., 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008).

The Court finds this argument unpersuasive. Plaintiffs' theory is that the UFC has acquired monosopnistic power over the Elite Fighters services market, which necessarily means that the market is a single-brand market. Further, Defendant fails to cite to controlling case law in support of its position. Therefore, the Court rejects Defendant's argument that the term "elite" is so vague or circular as to render Plaintiff's relevant market "legal defective." "And since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may

1   survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial."

2   Newcal, 513 F.3d at 1044.

3                              **C.  Specificity of Anticompetitive Conduct**

4           Third, Zuffa argues that:  1) exclusive dealing arrangements are common, procompetitive,

5   and an integral feature of the sports and entertainment businesses; 2) Plaintiffs failed to allege

6   specific facts plausibly showing that Zuffa's exclusive dealing arrangements foreclose competition

7   in either relevant market. Zuffa further argues that Plaintiffs fail to show: substantial foreclosure

8   of athletics; foreclosure in competition for exclusive contracts; duration of exclusivity; percentage

9   of market foreclosure; foreclosure of event venues; substantial foreclosure of sponsors; substantial

10  foreclosure of television distribution outlets; and 3) the UFC has no duty to deal with competitors.

11  Because the Court does not construe Plaintiffs' Complaint to argue that UFC must "deal with"

12  competitors but, rather, Plaintiffs argue that UFC's behavior is anticompetitive, the Court

13  addresses only the first two arguments.

14          As stated previously, "to state a valid claim under the Sherman Act, a plaintiff must allege

15  that the defendant has market power within a 'relevant market.'" Newcal, 513 F.3d at 1044. "There

16  is no requirement that these elements of the antitrust claim be pled with specificity." Id. at 1045.

17  Therefore the Plaintiff need not plead specific facts plausibly showing that the exclusivity

18  provisions in Zuffa's contracts are anticompetitive. Rather, in the Ninth Circuit, there must be a

19  "'preliminary showing of significant and more-than-temporary harmful effects on competition

20  (and not merely upon a competitor or customer)' before these practices can rise to the level of

21  exclusionary conduct." Am. Prof'l Testing Serv., 108 F.3d at 1151. Such conduct may be inferred,

22  for example, by market share. Id. "[E]xclusive dealing arrangement violates Section 1 only if its

23  effect is to 'foreclose competition in a substantial share of the line of commerce affected.' Allied

24  Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP, 592 F.3d 991, 996 (9th Cir. 2010).

25          Plaintiffs identity various clauses in UFC's exclusivity contracts that are anticompetitive.

26  See Compl. ¶ 113. These contracts contain an "Exclusivity Clause," which restricts fighters from

27  appearing in other rival MMA events and includes various termination and extension clauses that

28  can be triggered at the UFC's sole discretion, thereby effectively extending the exclusivity

provisions indefinitely. Compl. ¶ 113(a). The "Champion's Clause" prevents fighters from soliciting competing bids from other MMA Promotions even after the end of his or her original UFC contract term. Id. ¶113(b). The "Right to First Offer" and "Right to Match" Clauses, grant the UFC the option to match the financial terms and conditions of any offer made to a UFC Fighter for an MMA bout even after the Fighter's contract has expired. Id. ¶113(c). The "Ancillary Rights Clause" grants the UFC exclusive and perpetual worldwide personality and Identity rights not only of the UFC Fighter, but of "all persons associated with" the athlete, in any medium, including merchandising, video games and broadcasts, and for all other commercial purposes, thus preventing MMA Fighters from financially benefiting from the reputations that they built during their MMA careers even after death, and locking UFC Fighters out of revenues generated by the exploitation of their Identities, including after the term of the contract. Id. ¶113(d). The "Promotion Clause" requires UFC Fighters to attend, cooperate and assist in the promotion of bouts in which they fight and, as required by the UFC, *any other* bouts, events, broadcasts, press conferences and sale of merchandise, for no additional compensation. Id. ¶113(e). Last, contracts contain a "Retirement Clause," which gives the UFC the power "to retain the rights to a retired fighter in perpetuity." Id. ¶113(f).

Defendant argues that its exclusive dealing agreements are insufficient to establish anticompetitive behavior, particularly in the competitive sports context and that Plaintiffs must allege facts showing that the "effect is to 'foreclose competition in a substantial share of the line of commerce affected.'" Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., LP, 592 F.3d 991, 996 (9th Cir. 2010).

However, Plaintiffs allege multiple acts that, as a whole, constitute an anticompetitive scheme. Exclusive dealing arrangements are but a part of this scheme. For example, Plaintiffs allege that UFC's exclusionary scheme included the use of threats, intimidation, and retaliation against MMA fighters who work with or for would-be rivals or speak out against the UFC. Compl ¶¶ 116-19. Therefore, Defendant has, "by successfully eliminating and impairing actual or potential rivals in the Relevant Output Market … garnered and maintained unrivaled bargaining power vis-à-vis Elite Professional MMA Fighters." Compl. ¶ 111. Last, "[t]he UFC has also used

its ill-gotten power in the Relevant Markets to restrict its actual or potential rivals' access to top quality venues, sponsors, endorsements, PPV and television broadcast outlets." Compl. ¶ 73. Plaintiffs allege that "[t]he anticompetitive effects associated with [defendant's] [] monopsony power manifest themselves as: artificially suppressed compensation for Elite Professional MMA Fighters in the Bout Class, and the improper expropriation of Elite Professional MMA Fighters' Identities, resulting in artificial underpayments (including non-payment) to UFC Fighters in the Identity Class." Compl. ¶ 107. As a result, Plaintiffs further argue that the Defendant "now controls approximately 90% of the revenues derived from live Elite Professional MMA bouts." Compl. ¶ 7.

As the Ninth Circuit has held, "in the antitrust context, the 'character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" Costco Wholesale Corp. v. Maleng, 522 F.3d 874, 886 (9th Cir. 2008) (quoting Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962)).

Defendant replies by characterizing these various allegations as a "monopoly broth," which it argues is insufficient to establish anticompetitive conduct. However, Defendant overlooks the scheme that Plaintiff alleges, and concerns itself instead with the validity of the exclusive dealing agreements. Defendant argues that, because exclusive dealing arrangements are legal, the entire scheme should be deemed such. Reply at 4.

The Court disagrees with the contention that a single element of a scheme, if legal, makes legal the conduct as a whole. One of the cases Defendant cites in its own brief belies this claim: "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect. … We are not dealing with a mathematical equation. We are dealing with what has been called the 'synergistic effect' of the mixture of the elements." City of Anaheim v. S. California Edison Co., 955 F.2d 1373, 1376 (9th Cir. 1992). Only where "we are shown is a number of perfectly legal acts, [does] it become[] much more difficult to find overall wrongdoing." Id.

///

///

- 16 -

1    The Court therefore finds that, as a whole, Plaintiffs plead facts showing that the scheme

2    is anticompetitive such that the "effect is to 'foreclose competition in a substantial share of the line

3    of commerce affected.'" Allied Orthopedic, 592 F.3d at 996.

4              **D.  Ancillary Rights and Reduced Competition**

5              Specifically, Zuffa argues that: 1) name and likeness licenses are common and

6    procompetitive; 2) contractual restrictions on the use of the UFC name and marks are the legitimate

7    exercise of Zuffa's intellectual property rights and are not anticompetitive; and 3) Plaintiffs'

8    identity rights claims do not state an antitrust violation.

9              Applying the analysis above regarding exclusive dealing contracts, which include the

10   ancillary rights clause, the Court finds that as a whole, Plaintiffs have pled facts showing that the

11   scheme is anticompetitive such that the "effect is to 'foreclose competition in a substantial share

12   of the line of commerce affected.'" Allied Orthopedic, 592 F.3d at 996. In light of the sufficiency

13   of the allegations of the Complaint, and given the pleading standard set out in Fed. R. Civ. P.

14   12(b)(6) and with regards to the Sherman Act in particular, the Court finds the Plaintiffs have

15   sufficiently stated the second factor of a Section 2 claim: that the Defendant maintained its

16   monopolistic/monopsonistic power by allegedly anticompetitive behavior.

17            **E.  Anticompetitive Effect of Zuffa's Acquisitions**

18            Defendant argues that: 1) all but one of the acquisitions that Plaintiffs discuss occurred

19   outside the applicable four-year statute of limitations; 2) Plaintiffs have not pled facts showing

20   plausible high barriers to entry in the promotion of MMA bouts; 3) Plaintiffs have not pled any

21   specific, plausible allegations from which the court could conclude that the Strikeforce acquisition

22   had any anticompetitive effect; and 4) Plaintiffs fail to plead specific facts showing that the

23   acquisitions have reduced output.

24            At the pleading stage, the Court need only find that the Plaintiffs have "allege[d] sufficient

25   facts from which the court can discern the elements of an injury resulting from an act forbidden

26   by the antitrust laws.'" Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co., 99 F.3d 937, 950

27   (9th Cir. 1996). "To show antitrust injury, a plaintiff must prove that his loss flows from an

28   anticompetitive aspect or effect of the defendant's behavior" Rebel Oil, 51 F.3d at 1433

1    Plaintiffs allege multiple antitrust injuries: "As a result of the UFC's scheme: (i)

2    compensation associated with fighting in MMA bouts to members of the Bout Class has been and

3    continues to be artificially suppressed, and (ii) the Identities of UFC Fighters continues to be

4    expropriated and compensation by the UFC and its licensees for the expropriation of, exploitation

5    of and right to exploit Identities of the members of the Identity Class has been and continues to be

6    artificially suppressed. In addition, the anticompetitive effects of the UFC's exclusionary scheme

7    in the Relevant Markets include, inter alia: A) reduced competitiveness of live Elite Professional

8    MMA events; B) artificially suppressed output in the Relevant Output Market, including reduced

9    number of live Elite Professional MMA bouts than would exist in the absence of the challenged

10   anticompetitive scheme; and, C) artificially suppressed demand in the Relevant Input Market."

11   Compl. ¶ 151.

12    In light of these alleged injuries, the Court finds that the Plaintiff has sufficiently plead

13   antitrust injuries sufficient to survive a motion to dismiss.

14

15   **V.    CONCLUSION**

16    **IT IS ORDERED** that in the following:

17    Case no. 2:15-cv-01045-RFB-PAL Motion to Dismiss (ECF No. 64) is DENIED;

18   Stipulation of Electronically Stored Information (ECF No. 160) is GRANTED;

19    Case no. 2:15-cv-01046-RFB-PAL, Motion to Dismiss (ECF No. 16) is DENIED;

20    Case no. 2:15-cv-01055-RFB-PAL, Motion to Dismiss (ECF No. 39) is DENIED;

21    Case no. 2:15-cv-01056-RFB-PAL, Motion to Dismiss (ECF No. 39) is DENIED;

22    Case no. 2:15-cv-01057-RFB-PAL, Motion to Dismiss (ECF No. 16) is DENIED.

23    **DATED**: October 19, 2016.

24    _____

25    **RICHARD F. BOULWARE, II**

26    **UNITED STATES DISTRICT JUDGE**

27

28